[This decision has been published in *Ohio Official Reports* at 96 Ohio St.3d 308.]

THE STATE EX REL. COMMITTEE FOR THE REFERENDUM OF CITY OF LORAIN ORDINANCE NO. 77-01 *v.* LORAIN COUNTY BOARD OF ELECTIONS ET AL.

[Cite as *State ex rel. Commt. for the Referendum of Lorain Ordinance No. 77-01 v. Lorain Cty. Bd. of Elections*, 2002-Ohio-4194.]

*Elections—Mandamus sought to compel Lorain County Board of Elections to reinstate its July 25, 2001 certification of signatures on a referendum petition, vacate and reverse its January 23, 2002 decision sustaining a protest of signatures on the part petition and to announce and certify the November 6, 2001 election results for the referendum on Ordinance No. 77-01—Writ denied, when.*

(No. 2002-0524—Submitted August 9, 2002—Decided August 16, 2002.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶1} On June 7, 2001, the Council of the city of Lorain, Ohio, enacted Ordinance No. 77-01, which reclassified approximately 202.7 acres of land located off Jaeger Road in Lorain from R-1A "Residential" to R-PUD "Residential Planned Unit Development." Relator, Committee for the Referendum of Ordinance No. 77-01, Citizens for a Better Lorain, circulated a referendum petition requesting that Ordinance No. 77-01 be submitted to Lorain voters at the November 6, 2001 general election. Denver Casto is the chairman of the committee. Casto circulated certain part-petitions for the referendum, including Part Petition No. 23.

{¶2} On July 6, 2001, the committee filed the referendum petition with the Lorain Auditor. The petition consisted of 71 part-petitions and contained 2,025 signatures. On July 17, 2001, the city auditor submitted the petition to respondent Lorain County Board of Elections to certify the number of valid signatures on the

petition. On July 25, 2001, the board certified that the petition contained 1,584 valid signatures, which exceeded the 1,562 valid signatures needed to place the referendum on Ordinance No. 77-01 on the November 6, 2001 election ballot.

{¶3} Shortly before the city auditor certified the sufficiency of the petition, on August 6, 2001, intervening respondent, Thomas Oster, and Evelyn Oster, taxpayers and resident electors of Lorain, submitted a written protest to the board challenging the referendum petition and the board's July 25, 2001 determination that the petition contained 1,584 valid signatures. Thomas and Evelyn Oster are owners and officers of Oster Construction, Inc., a corporation engaged in the business of real estate development, construction, and sales. The corporation owns a portion of the real property rezoned by Ordinance No. 77-01 and has entered into a contract to purchase the rest of the rezoned property.

{¶4} In their August 6, 2001 protest, the Osters contested the validity of three categories of signatures contained in the referendum petition: (1) the signatures of individuals who signed the petition when they were not registered electors; (2) the signatures on part-petitions circulated by individuals who were not registered electors at the time they circulated them; and (3) the signatures on those part-petitions in which the circulators knew that one or more individuals signing the petition were not registered electors at the time they signed.

{¶5} On August 30, 2001, the board held a hearing on the Osters' August 6 protest and denied the protest. On the previous day, Thomas Oster had learned that one of the signers of Part Petition No. 23 of the referendum petition had signed the petition, but Casto, the purported circulator of the part-petition, had not presented the petition to her or witnessed her signature. Oster's counsel contacted the board's attorney, who stated that the board would probably permit him to introduce this new evidence at the August 30 protest hearing. The board, however, decided not to consider Oster's new claims because they had not been the subject of any written protest. Oster proffered Graff's affidavit as well as the affidavits of four signers

2

and prospective signers, stating that Casto and another circulator, John Franko, had made false and misleading statements to them concerning the effect of Ordinance No. 77-01.

{¶6} We ultimately upheld the board's denial of the Osters' August 6, 2001 protest by denying the writ of prohibition requested by the Osters to prevent the board and Lorain from proceeding with the November 6, 2001 referendum election on Ordinance No. 77-01. *State ex rel. Oster v. Lorain Cty. Bd. of Elections* (2001), 93 Ohio St.3d 480, 756 N.E.2d 649.

{¶7} On September 13, 2001, Thomas Oster ("Oster") filed a second written protest with the board of elections against the referendum petition. In this protest, Oster raised the claims that he had previously tried to raise at the August 30 board hearing on his first protest. Oster asserted that Casto and Franko had engaged in a pattern of making false and misleading statements to prospective signers in violation of R.C. 3599.14, and that Casto falsely swore that he had witnessed the affixing of every signature on Part Petition No. 23, thereby violating R.C. 3501.38(E). Attached to Oster's September 13 protest were the five affidavits he had previously proffered to the board at the August 30 hearing. Graff specified in her affidavit that she had signed Part Petition No. 23, that it had been presented to her by two women, and that Casto had never presented the petition to her. In Part Petition No. 23, Casto had declared under penalty of falsification that he had circulated the petition and that he had witnessed the affixing of every signature.

{¶8} On September 24, 2001, Oster submitted three additional affidavits to the board in support of his September 13, 2001 protest. In these affidavits, three additional signers of Part Petition No. 23 reiterated Graff's sworn statement that the part-petition had been presented to them by women rather than Casto and that Casto had never witnessed their signatures.

{¶9} At the board's September 24, 2001 meeting, it considered whether it should schedule a full evidentiary hearing on Oster's September 13 protest. At the

meeting, a board member expressed concern about allowing more than one protest for referendum petitions. The board subsequently decided that in lieu of an evidentiary hearing on the September 13 protest, it would permit Casto to provide an affidavit acceptable to the board's counsel by September 27, 2001, reaffirming that he witnessed all signatures on the part-petition he circulated. If Casto failed to file the affidavit by September 27, the board would immediately set a hearing on Oster's September 13 protest.

{¶10} On September 27, 2001, the committee provided the board with the requested affidavit. In his affidavit, Casto stated that he had circulated Part Petition No. 23, that he had witnessed the affixing of every signature, and that all of the signatures on the part-petition had been signed in his presence. The board conducted no further hearings or investigations on the September 13 protest before the November 6, 2001 election.

{¶11} On October 9, 2001, Oster filed a complaint in the Lorain County Court of Common Pleas for a writ of prohibition to prevent the board and Lorain from submitting the referendum on Ordinance No. 77-01 to Lorain electors at the November 6, 2001 general election. Oster also requested a preliminary injunction. On October 18, 2001, Oster filed an amended complaint in the common pleas court in which he added claims for a declaratory judgment that he was entitled to a hearing before the board on his September 13, 2001 protest and a writ of mandamus to compel the board to hold a hearing on his September 13 protest. The common pleas court granted the committee's motion to intervene as a respondent.

{¶12} On October 19, 2001, Judge Edward M. Zaleski of the common pleas court held a hearing on Oster's motion for a preliminary injunction. At the hearing, numerous witnesses testified that Casto, the purported circulator of Part Petition Nos. 23 and 26, did not present the petition to them and did not witness their signatures. In addition, affidavits of various petition signers reiterated, in effect, that Casto had lied about circulating these part-petitions and witnessing the

4

signatures contained therein. In an October 17, 2001 deposition, Casto refuted the testimony of these witnesses by specifying that he had circulated Part Petition No. 23 and that he had witnessed every signature on that part-petition. Casto invoked his Fifth Amendment privilege against self-incrimination in refusing to answer questions concerning statements he made to prospective signers.

{¶13} On November 1, 2001, Judge Zaleski continued the hearing on Oster's motion for a preliminary injunction and prohibited the board "from announcing and/or certifying the election results on the Referendum for the City of Lorain Ordinance No. 77-01, now also known as City of Lorain Issue No. 8 until there is a final adjudication of the herein action or a modification of this order." Judge Zaleski also ordered that "[a]ll information and reports setting forth the outcome on the election on Issue No. 8 shall be sealed by the Board pending the final adjudication of the herein action." The November 1 common pleas court order was agreed to by the committee, the board, and Oster, and was signed by their respective counsel.

{¶14} On November 6, 2001, the election of the referendum was held, but because of the agreed order entered by the common pleas court, the result was sealed and was not announced or certified. On December 7, 2001, Judge Zaleski recused himself due to a possible conflict of interest, and the case was assigned to Judge Kosma J. Glavas.

{¶15} On December 20, 2001, Judge Glavas ordered the board to conduct a full and complete hearing on Oster's September 13, 2001 protest. Judge Glavas denied the claims of the board, committee, and city that laches on the part of Oster barred his action. Judge Glavas also prohibited the board from announcing and certifying the November 6, 2001 election result on the referendum.

{¶16} On January 23, 2002, however, Judge Glavas vacated his December 20, 2001 order because Oster had not specifically moved for the affirmative mandamus relief granted by him. Judge Glavas specified that despite this ruling,

the board, "on its own volition, has the discretion and authority to afford Oster a full and complete hearing regarding the September 13, 2001 protest." Judge Glavas further dismissed Oster's prohibition claim for lack of jurisdiction and denied the committee and board's motions to dismiss based on laches and res judicata. Finally, he continued the November 1, 2001 consent entry enjoining the board from announcing and/or certifying the November 6, 2001 election results for the referendum issue pending further order of the court.

{¶17} On January 23, 2002, the board held a hearing on Oster's September 13, 2001 protest. At the hearing, the board decided to proceed with its consideration of the protest despite Judge Glavas's January 23 order vacating his previous order compelling the board to conduct the hearing. The board decided that Judge Glavas would simply reissue the same order at some future date. Before proceeding, the board denied the committee's motion to dismiss the protest because of laches and res judicata. After being provided the sworn testimony and affidavits of numerous witnesses from the common pleas court case stating that Casto did not circulate Part Petition No. 23 and did not witness their signatures on that part-petition, the board sustained Oster's September 13, 2001 protest, ruled Part Petition No. 23 invalid, and decertified the referendum issue for the ballot. The board determined that without the 23 valid signatures on Part Petition No. 23, the petition did not contain sufficient valid signatures for placement on the ballot. There was evidence that Casto did not witness at least ten signatures on Part Petition No. 23.

{¶18} As a result of the board's January 23, 2002 decision, the common pleas court dismissed Oster's case as moot on February 27, 2002.

{¶19} Sixty-nine days following the board's January 23 decision to sustain Oster's protest and decertify the referendum on Ordinance No. 77-01 from the election ballot, on April 2, 2002, the committee filed this action for a writ of mandamus to compel the board of elections to reinstate its July 25, 2001 certification of signatures, to announce and certify the November 6, 2001 election

results of the referendum on Ordinance No. 77-01, and to vacate and reverse the board's January 23 decision. The board filed an answer in which it admitted many of the allegations in the committee's complaint and agreed with the committee that laches should have barred Oster's September 13 protest. Oster filed a motion for leave to intervene as a respondent and a motion to dismiss.

{¶20} In June 2002, we granted Oster's motion to intervene, granted an alternative writ, and issued a schedule for the presentation of evidence and briefs. *State ex rel. Commt. for the Referendum of Lorain Ordinance No. 77-01 v. Lorain Cty. Bd. of Elections*, 95 Ohio St.3d 1484, 2002-Ohio-2625, 769 N.E.2d 401. This case was fully briefed on August 5, 2002.

{¶21} This cause is now before the court for a consideration of the merits.

Mandamus in Election Cases

{¶22} The committee asserts that it is entitled to the requested writ of mandamus to compel the board to reinstate its July 25, 2001 certification of signatures, vacate and reverse its January 23, 2002 decision sustaining Oster's protest, and announce and certify the November 6, 2001 election results for the referendum on Ordinance No. 77-01.

{¶23} We may vacate the decision of a board of elections and grant a writ of mandamus if the committee establishes that the board's decision resulted from fraud, corruption, abuse of discretion, or clear disregard of applicable law. See *State ex rel. O'Beirne v. Geauga Cty. Bd. of Elections* (1997), 80 Ohio St.3d 176, 179, 685 N.E.2d 502. We may also decide this matter despite the passage of the election when a court has sealed the election result pending further proceedings. See, e.g., *State ex rel. The Ryant Commt. v. Lorain Cty. Bd. of Elections* (1999), 86 Ohio St.3d 107, 712 N.E.2d 696.

{¶24} The committee claims that the board abused its discretion and clearly disregarded applicable law when it decided on January 23, 2002, to sustain Oster's September 13, 2001 protest and to decertify the referendum election on Ordinance

No. 77-01. The committee asserts that the protest should have been denied because of laches and res judicata. The committee further contends that the board erred in invalidating all of the signatures on Part Petition No. 23. The respondent board concurs that laches should have barred its further consideration of Oster's protest, but it asserts that it did not abuse its discretion in conducting a full hearing on the protest or in invalidating all of the signatures on Part Petition No. 23. Oster argues that any claims of laches and res judicata to bar his protest are meritless because of the committee's own laches. Oster further contends that the common pleas court's rulings in his case barred the committee's claims. Oster also concurs with the board that the committee's violation of R.C. 3501.38(E) rendered Part Petition No. 23 completely defective. For the following reasons, we find that although Oster's claims of laches and res judicata are meritless, the committee is nevertheless not entitled to the requested extraordinary relief in mandamus.

### Oster's Claim of Laches

{¶25} Oster asserts that the committee's mandamus action is barred by laches because it waited 69 days to file this action to challenge the board's January 23, 2002 decision.

{¶26} "It is axiomatic that relators in election cases must act with the utmost diligence." *State ex rel. Ditmars v. McSweeney* (2002), 94 Ohio St.3d 472, 479, 764 N.E.2d 971. "A relator seeking extraordinary relief in an election-related matter bears the burden of establishing that [it] acted with the required diligence, and if the relator fails to do so, laches may bar the action." *State ex rel. Newell v. Tuscarawas Cty. Bd. of Elections* (2001), 93 Ohio St.3d 592, 595, 757 N.E.2d 1135. The public interest in having election cases decided even, as here, after an election has already been held, requires extreme promptitude. See *In re Election of Member of Rock Hill Bd. of Edn.* (1996), 76 Ohio St.3d 601, 606-607, 669 N.E.2d 1116; see, also, *Ryant*, 86 Ohio St.3d at 113-114, 712 N.E.2d 696.

8

**{¶27}** By delaying 69 days to challenge the board's January 23, 2002 decision through this extraordinary writ action, the committee did not act with the extreme diligence and promptness normally required of relators in election cases.

**{¶28}** Nevertheless, as we have previously held, respondents in an election case "cannot be afforded the benefit of the doctrine when they come to the court having substantially contributed to the delay in question." *State ex rel. Commt. for the Referendum of Ordinance No. 3543-00 v. White* (2000), 90 Ohio St.3d 212, 216, 736 N.E.2d 873. Here, the majority of the delay associated with this election controversy was engendered by Oster's failure to raise his claims concerning the committee's violation of R.C. 3501.38(E) in a more timely fashion by not including them in his August 6, 2001 protest, not filing his September 13, 2001 protest closer to his August 29, 2001 discovery of the R.C. 3501.38(E) violation, and not instituting his common pleas court action until 12 days after Casto filed the affidavit ordered by the board at its September 24 meeting.

**{¶29}** Furthermore, the board does not claim that this mandamus action is barred by laches.

**{¶30}** Therefore, we reject Oster's contention that the committee's claims are barred by laches.

### Oster's Claim of Res Judicata

**{¶31}** Oster next contends that because the common pleas court denied the committee and the board's claims of laches and res judicata in Judge Glavas's entries of December 20, 2001, and January 23, 2002, res judicata bars the committee from claiming entitlement to a writ of mandamus based on these same claims.

**{¶32}** The doctrine of res judicata provides that a " 'valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action.' " *Kelm v. Kelm* (2001), 92 Ohio St.3d 223, 227, 749 N.E.2d 299, quoting

*Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 653 N.E.2d 226, syllabus. "Res judicata bars the litigation of all claims that either were or might have been litigated in a first lawsuit." *Hughes v. Calabrese*, 95 Ohio St.3d 334, 2002-Ohio-2217, 767 N.E.2d 725, ¶ 12.

**{¶33}** Res judicata does not bar the committee's claims of laches and res judicata here. Neither the December 20, 2001 nor the January 23, 2002 orders were valid, final judgments rendered upon the merits. At best, the common pleas court's December 20 and January 23 decisions on laches and res judicata were, as that court noted, "both interlocutory orders" that merged into its dismissal of the entire case as moot because of the board's January 23 decision. In the absence of a judgment on the merits, res judicata does not bar the committee's claims. See *Crestmont Cleveland Partnership v. Ohio Dept. of Health* (2000), 139 Ohio App.3d 928, 933-934, 746 N.E.2d 222 (denial of claim based on mootness did not bar same claim from being subsequently raised).

Mandamus-Laches

**{¶34}** The committee asserts that the board abused its discretion and clearly disregarded applicable law by sustaining Oster's September 13, 2001 protest because Oster's challenge to the referendum petition was barred by laches. Oster counters that the committee cannot rely on laches because of its misconduct in violating R.C. 3501.38(E) by filing a false circulator statement.

**{¶35}** Oster's argument has merit. As we expressly held in *Commt. for the Referendum of Ordinance No. 3543-00*, 90 Ohio St.3d at 216, 736 N.E.2d 873, "Although laches is not an affirmative defense in an election matter, *i.e.*, respondents are not required to raise the defense, *laches is still an equitable doctrine*." (Emphasis added.) As an equitable doctrine, laches is subject to the fundamental doctrine that "he who seeks equity must do equity, and that he must come into court with clean hands." *Christman v. Christman* (1960), 171 Ohio St. 152, 154, 12 O.O.2d 172, 168 N.E.2d 153; see, also, *Commt. for the Referendum of*

10

*Ordinance No. 3543-00*, 90 Ohio St.3d at 216, 736 N.E.2d 873, citing *Christman* in precluding the application of laches in an election case.

**{¶36}** The committee mistakenly relies on our decision in *State ex rel. Demaline v. Cuyahoga Cty. Bd. of Elections* (2000), 90 Ohio St.3d 523, 740 N.E.2d 242, to support its contention that the "clean hands" doctrine does not apply to election cases involving writs of mandamus. In *Demaline*, 90 Ohio St.3d at 527, 740 N.E.2d 242, we merely held that "[t]he 'clean hands' doctrine is inapplicable here"; we did not hold that this doctrine is *never* applicable in election cases. In fact, our decision in *Commt. for the Referendum of Ordinance No. 3543-00*, 90 Ohio St.3d at 216, 736 N.E.2d 873, establishes otherwise.

**{¶37}** In addition, in *Demaline*, 90 Ohio St.3d at 527, 740 N.E.2d 242, we were faced with only a "minimal delay" on the part of others that did not excuse relator's delay.

**{¶38}** By contrast, the substantial evidence credited by the board here established that Casto, the committee's chairman, knowingly violated R.C. 3501.38(E) by filing a false circulator's statement for Part Petition No. 23. "[A]lthough there is no *mens rea* requirement under R.C. 3501.38(E), where a circulator attests that he witnessed all signatures on a part-petition when in fact he knows he did not, he cannot be attesting to such a statement in a manner other than knowingly." *Prince v. Franklin Cty. Bd. of Elections* (Dec. 24, 1998), 10th Dist. No. 98AP-495, 1998 WL 894724; see, also, *Morford v. Pyle* (1928), 53 S.D. 356, 361-362, 220 N.W. 907. It is unquestionable that "[a] knowing violation of applicable law would certainly preclude a party from asserting the * * * equitable [doctrine] of laches." *State ex rel. Mallory v. Pub. Emp. Retirement Bd.* (1998), 82 Ohio St.3d 235, 244, 694 N.E.2d 1356.

**{¶39}** Given Casto's knowing violation of R.C. 3501.38(E) as well as his subsequent false statements in his affidavit and deposition testimony, the committee is precluded from invoking the equitable doctrine of laches to support

its mandamus claim.[1]   In addition, the committee agreed to the November 1, 2001 sealing of the election results and delayed 69 days from the board's January 23, 2002 decision to file this action.  Therefore, the board neither abused its discretion nor clearly disregarded applicable law by refusing to hold that laches barred Oster's protest.   As noted by Oster, permitting Casto's knowing violation of R.C. 3501.38(E) to have no consequences on the committee's attempt to seek extraordinary relief in mandamus would effectively destroy the integrity of the election process.

### Res Judicata

{¶40} For comparable reasons, the board neither abused its discretion nor clearly disregarded applicable law by not denying Oster's protest based on res judicata.

{¶41} "[R]es judicata is not a shield to protect the blameworthy." *Davis v. Wal-Mart Stores, Inc.* (2001), 93 Ohio St.3d 488, 491, 756 N.E.2d 657.  "There is something wrong with a legal doctrine that could be used in a situation like the one before us to reward a party for misrepresenting * * * evidence."  Id.

{¶42} We refuse to reward the committee for misrepresenting that its chairman had complied with R.C. 3501.38(E) when, in fact, he had not.  The board also recognizes that it would be inequitable to apply res judicata here.

{¶43} Therefore, the board did not err in refusing to apply res judicata to Oster's September 13 protest.

### R.C. 3501.38(E) Circulator Statement

{¶44} Finally, the committee contends that the board erred in invalidating all of the signatures on Part Petition No. 23 when it concluded that Casto violated R.C. 3501.38(E).

---

1.  A circulator is an agent of the petitioners and they are bound by the circulator's acts.  See, e.g., *Nist v. Herseth* (S.D. 1978), 270 N.W.2d 565, 569.

**{¶45}** R.C. 3501.38(E) provides that circulators must attest that they witnessed the affixing of every signature on the petition papers circulated by them:

**{¶46}** "On each petition paper, *the circulator* shall indicate the number of signatures contained on it, and *shall sign a statement made under penalty of election falsification that the circulator witnessed the affixing of every signature*, that all signers were to the best of the circulator's knowledge and belief qualified to sign, and that every signature is to the best of the circulator's knowledge and belief the signature of the person whose signature it purports to be."

**{¶47}** The board concluded that based on the substantial, credible evidence introduced by the parties, Casto violated R.C. 3501.38(E) by signing a false circulator statement because he did not witness every signature on Part Petition No. 23. This conclusion is supported by the evidence in the record. *State ex rel. Wolfe v. Delaware Cty. Bd. of Elections* (2000), 88 Ohio St.3d 182, 185, 724 N.E.2d 771 ("We will not substitute our judgment for that of a board of elections if there is conflicting evidence on an issue").

**{¶48}** Nor did the board err in allowing the introduction of additional evidence submitted after the September 13 protest. Under R.C. 3501.39(A)(3), the board was empowered to consider this evidence, particularly since by the time of the January 23, 2002 hearing, the committee had had notice of this evidence and the opportunity to rebut and respond to it. Cf. *State ex rel. Cooker Restaurant Corp. v. Montgomery Cty. Bd. of Elections* (1997), 80 Ohio St.3d 302, 308, 686 N.E.2d 238.

**{¶49}** Most important, the board did not abuse its discretion or clearly disregard applicable law in ruling that all of the signatures on Part Petition No. 23 were invalid. The settled rule is that election laws are mandatory and require strict compliance and that substantial compliance is acceptable only when an election provision expressly states that it is. *State ex rel. Phillips v. Lorain Cty. Bd. of Elections* (2001), 93 Ohio St.3d 535, 539, 757 N.E.2d 319. R.C. 3501.38(E)

demands strict compliance. See *State ex rel. Barton v. Butler Cty. Bd. of Elections* (1975), 44 Ohio St.2d 33, 35, 73 O.O.2d 156, 336 N.E.2d 849.

**{¶50}** Notwithstanding the committee's arguments to the contrary, the board acted appropriately when it invalidated the entire twenty-third part-petition where the circulator, Casto, had, contrary to his statement on the part-petition, not witnessed every signature being affixed to that part-petition. See *Prince*, supra; *State ex rel. Zahneis v. Hamilton Cty. Bd. of Elections* (1971), 27 Ohio App.2d 233, 235-236, 56 O.O.2d 402, 273 N.E.2d 797; see, also, *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 149, 580 N.E.2d 767 ("we denied a writ of mandamus to compel an election pursuant to [an] earlier petition, in part because evidence before the board suggested that Hinkle had not witnessed all the petition signatures declared in the circulator's statements"). The committee's citation of *State ex rel. Dennis v. Miller* (1971), 28 Ohio St.2d 1, 57 O.O.2d 62, 274 N.E.2d 459, is not persuasive because that case did not involve any claimed violation of R.C. 3501.38(E).

Conclusion

**{¶51}** Based on the foregoing, the committee failed to establish that the board had either abused its discretion or clearly disregarded applicable law by sustaining Oster's protest and decertifying the referendum on Ordinance No. 77-01. Therefore, we deny the writ of mandamus.

Writ denied.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

Phillips & Co., L.P.A., and Gerald W. Phillips, for relator.

Gregory A. White, Lorain County Prosecuting Attorney, and Gerald A. Innes, Assistant Prosecuting Attorney, for respondent Lorain County Board of Elections.

Riley, Resar & Associates, P.L.L., and Kenneth R. Resar, for intervening respondent Thomas Oster.

_____